No. 94,999

DEBRA L. MILLER, in her Capacity as the Secretary of Transportation for the State of Kansas, *Appellee,* v. GLACIER DEVELOPMENT CO., L.L.C., *et al., Appellants.*

(161 P.3d 730)

Opinion filed
July 13, 2007.

*Reid F. Holbrook,* of Holbrook & Osborn, P.A., of Overland Park, argued the cause, and *Judd L. Herbster,* of the same firm, and *Joy D. Hays,* of Polsonelli Shalton Welte Suelthaus, P.C., of Kansas City, Missouri, were with him on the briefs for appellants.

*Timothy P. Orrick,* of Foth & Orrick, L.L.P., of Overland Park, argued the cause, and *Renee M. Gurney,* of the same firm, was with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: In this appeal from an eminent domain proceeding, appellant Glacier Development Company, LLC (Glacier) challenges the jury's $800,000 award for the taking of its real property by the Kansas Department of Transportation (KDOT).

This appeal raises five questions: (1) Did the district court err in admitting evidence of the purchase prices of the subject parcels of land? (2) Did the district court err in rejecting Glacier's motion for continuance of the trial after ruling that evidence of the purchase prices would be admitted? (3) Did the district court err by excluding evidence of a value engineering study of alternative right-of-ways conducted on behalf of KDOT a year before the taking? (4) Did the district court err by refusing to quash the trial deposition of an opposing party in other litigation with Glacier? and (5) Did the district court err by allowing KDOT to (a) proceed first with its evidence and (b) make the last closing argument?

### Factual and Procedural Background

Lester M. Dean, Jr., is the sole owner and manager of Glacier. In 1995 and 1996, Glacier purchased 32.6 acres of real property (Lot 3) along Southwest Boulevard in Kansas City, Kansas. In 1996, Glacier also purchased a 0.98-acre parcel (Lot 1) along Southwest

Boulevard, upon which a brick office building is situated. Glacier purchased all of the property with the goal of developing the tracts into a business park.

Glacier invested considerable effort to validate its belief in the property's potential. In 1993, Glacier hired an engineering consulting firm to draft plans for buildings on the property. The property was zoned for heavy industrial use, and a final plat was approved. In addition, Glacier took steps to grade and level the property, which was visible from Interstate 35 (I-35), by moving earth and clearing vegetation.

Glacier also consulted engineers and architects on drainage and environmental impact, and obtained feasibility reports and surveys. In particular, Glacier hired Jerry Richardson, a professor of engineering at the University of Missouri-Kansas City, to develop a solution to intermittent flooding near the property. Richardson worked in conjunction with the U.S. Army Corps of Engineers to plan that solution.

During late July and early August 2001, KDOT engaged Ventry Engineering, LLC, (Ventry) to perform a value engineering study of the reconstruction of I-35 from Southwest Boulevard northeast to the Kansas-Missouri state line, which encompassed a large portion of Glacier's property. In September 2001, Ventry released its report, which contained estimates for right-of-way costs at or near Glacier's property. The report estimated the acquisition cost of a considerable portion of the property at $27 per square meter or approximately $2.51 per square foot. According to Glacier's calculations extrapolating from this number, the value of Glacier's land eventually taken by KDOT would be $3.5 million.

In April 2002, KDOT's counsel sent notice to Glacier that Lot 1 and Lot 3 would be taken for KDOT's I-35 reconstruction project. It later filed an eminent domain petition in Wyandotte County; the date of the taking was August 13, 2003. Court-appointed appraisers awarded Glacier $2.19 million for the fair market value of the property. KDOT appealed the appraisers' award to the district court.

In deposition testimony, Dean stated that he did not remember how much Glacier had paid for the subject property. He also tes-

tified at his deposition that he placed the value of the property at the time of the taking between $5.7 million and $6.5 million.

## Trial Evidence on Fair Market Value

When, as here, an entire tract of land is taken in a condemnation action, the measure of compensation is the fair market value of the property at the time of the taking. K.S.A. 26-513(b); *City of Wichita v. Meyer*, 262 Kan. 534, 548, 939 P.2d 926 (1997); *Urban Renewal Agency v. Tate*, 196 Kan. 654, 657, 414 P.2d 28 (1966); The proper remedy for a taking in Kansas is controlled by statute. *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 294, 64 P.3d 357 (2003). K.S.A. 26-513(e) defines "fair market value" as "the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion." Whether a prior sale is too remote in time is a question to be determined by the district court in the exercise of judicial discretion. *Mettee v. Kemp*, 236 Kan. 781, 790, 696 P.2d 947 (1985); *Willsey v. Kansas City Power & Light Co.*, 6 Kan. App. 2d 599, 615, 631 P.2d 268, *rev. denied* 230 Kan. 819 (1981).

There are three generally recognized approaches to valuation of real property: (1) the cost approach, *i.e.*, the reproduction cost of the property at the time of the taking less depreciation; (2) the market data approach, *i.e.*, the value of the property based upon recent sales of comparable properties; and (3) the income approach, *i.e.*, the capitalization of net income from the property. *City of Wichita v. Eisenring*, 269 Kan. 767, 774, 7 P.3d 1248 (2000). K.S.A. 26-513(e) provides that fair market value is determined by using any one or more of these methods.

The jury trial in this case began on June 13, 2005. At the trial, Dean did not offer his opinion of the value of the property at the time of the taking. Glacier's expert witnesses' values for the property's fair market value were $4,518,602, $4,000,000, and $4,657,000.

KDOT's experts set the total fair market value of the subject property at $463,000 and $530,000.

One of KDOT's experts was Bernie Shaner, a real estate appraiser. Shaner had appraised Lot 3 in 1993 when Burlington Northern Railroad, the property's previous owner, was going to sell it. His more recent appraisal work on Glacier's property began in July 2002.

Shaner acknowledged that the economic conditions in 1993 were "[p]robably not" the same as they were in 2003, but he indicated that the plat, which was in effect when Shaner performed his 1993 appraisal, had not been modified. Shaner also believed it significant that the property remained subject to a restriction under which it could not be developed until access from a public street was created on the property. This restriction was still in effect as of the date of the taking.

In Shaner's opinion, the highest and best use of the property was industrial, as a storage yard with a small office. Under this scenario, a building of approximately 2,000 square feet could be built and could use a septic system rather than extended utilities. Shaner testified that another alternative would develop 24.45 acres in the floodplain by using dirt fill and by extending the utilities to the property; however, Shaner expected the $3 million process necessary to prepare the property to outstrip its ultimate value. Another alternative, Shaner said, was to improve a smaller 4.5-acre site outside the floodplain. The estimated $312,000 cost associated with extending utilities and building road improvements would reflect the "worth" of the 4.5 acre building site.

The district court permitted KDOT to introduce, over objection, exhibits showing the prices Glacier paid in 1995 and 1996 for the two parcels of land. These prices were recorded in real estate sales validation questionnaires, or certificates of value (COVs), which are required to accompany a "deed or instrument providing for the transfer of title to real estate or affidavit of equitable interest in real estate" that is recorded in the office of the register of deeds. K.S.A. 79-1437c. Such questionnaires are to be retained for 5 years and then destroyed. The COVs showed the total paid for the subject property was $200,527—plaintiff's Exhibit 11 showed Lot 3 sold for $155,527, and plaintiff's Exhibit 12 showed Lot 1 sold for $45,000.

Shaner testified about the COVs, equating them to affidavits. Because of the passage of time between the purchases and the taking, Shaner said that the purchase prices "offer[ed] just a little indication as to what the market said that property was worth at that point in time." He admitted that he did not identify the information in the COVs as comparable sales in his valuation calculations for KDOT.

In conducting his appraisal on Lot 1, Shaner considered the market data approach and testified that the building on the property was of the lowest quality, despite improvements made by Dean. As part of this approach, Shaner examined four comparable sales and made adjustments for passage of time, market conditions, location, access, quality, design, age, condition, and flood zone location. Calculating the comparable sales to be between $14.20 and $20.04 per square foot, Shaner estimated the building on Lot 1 to have a value of $18 per square foot, or approximately $150,000.

Shaner also valued Lot 1 by using the income approach and examined rental comparables. After figuring the net operating income of the building on Lot 1 and calculating the capitalization rate, Shaner arrived at a value of $160,000.

Shaner used the market data approach to value Lot 3. He testified that, although Lot 3 consisted of more than 32 acres, approximately 8 acres lay in the channel of Turkey Creek. He therefore considered the usable area to be 24.45 acres. Shaner also testified about conditions of the property that would present challenges to development, such as limited road access and routing to the property. Moreover, Shaner said, a majority of the tract was in a 100-year floodplain. In addition, the sewer lines and public water lines did not lie within the property, and Shaner estimated it would cost about $40,000 to extend those lines under railroad tracks to the property line. Shaner examined five comparables and made adjustments for size, zoning, density, access to utilities, location, and access to each piece of property. These calculations led him to estimate Lot 3's value at $210,000.

In addition to Lots 1 and 3, Shaner valued Glacier's reversionary interest in two billboards on the property. Using comparable rentals, Shaner estimated the rent on each to be $18,000 per year. At

the time of the taking, Glacier would have gotten one of the billboard sites back in 16 years and 9 months; the second billboard site would have reverted to Glacier in 15 years and 11 months. Shaner concluded that the first billboard site's reversionary value was $44,881, and the second billboard site's reversionary value was $48,366, for a total of approximately $93,000.

All of the above led Shaner to a total estimated fair market value for the subject property of $463,000.

KDOT's second expert, Robert Marx, a real estate appraiser, also began his work in connection with the case in July 2002. He found it significant that trains surged by the subject property every 15 to 20 minutes during the day. He also found it significant that there was essentially no public access. As a result of Marx's investigation and analysis, he opined that access was highly restrictive, that any use would be subject to what the City determined was reasonable, and that the property had "flood issues," including the presence of the creek on a substantial part of the property. With regard to the COVs, Marx testified that the documents provided additional support for what his company had compiled in its database regarding this property over the years. He apparently did not otherwise use the figures the documents reflected in arriving at his estimate of fair market value.

Marx examined Glacier's property in light of all three approaches to valuation, but he focused on the market data approach and the income approach. Marx's opinion of the highest and best use of the building on Lot 1 was to use it as an "office/warehouse building." He acknowledged that the COV indicated that this property was purchased by Glacier for $45,000 and that improvements had been made since the sale and before he performed his appraisal. Marx noted substantial improvements to the "backbone" of the building, such as windows, electrical service, and heating and air conditioning; he described these as "expensive things." He noted that the interior of the building was older but functional. Marx examined five comparable properties upon which improvements had been made, and his adjusted comparable sales ranged from $16 to $23.58 per square foot. Marx concluded that the building

on Lot 1 was valued at $20 per square foot, or approximately $160,000.

With respect to the income approach on Lot 1, Marx examined six rental comparables. After figuring the net operating income of the building on Lot 1 and calculating the capitalization rate, Marx ultimately arrived at a value of $170,000.

As for Lot 3, Marx's opinion of the highest and best use was outside storage for industrial applications such as masonry supplies and building products, lumber, concrete, landscaping equipment, or use by a trucking company with "a lot of rolling stock." He explained that these types of industrial applications would involve no retail development. Marx used the market data approach to valuing Lot 3. He compared the sales of seven pieces of property and made adjustments based on property rights, terms and conditions, access, flood issues, size, topography, zoning, and condition. Based on an average adjusted price of 30 cents per square foot, Marx calculated the value of the usable portion of Lot 3 to be $300,000.

With respect to the two billboards, Marx concluded that the total reversionary value was approximately $60,000.

Given all of the above, Marx's total estimated fair market value was $530,000.

Glacier presented the testimony of three expert appraisers.

The first, Walter Clements, a real estate developer, used the income approach and a discounted cash flow analysis in developing his opinion on the subject property's value. Clements stated that one of the strongest attributes of the property was its visibility from I-35 and the 90,000 to 95,000 cars that passed it daily. He also viewed the property's proximity (2 miles) to the central business district in downtown Kansas City, Missouri, as favorable.

Clements opined that the highest and best use of the property was as "flex space" for research and development or as conventional warehouse space. He examined plans prepared by an engineering firm, came up with a development strategy involving 10 proposed pad sites, and considered a 1999 plan by the U.S. Army Corps of Engineers to improve Turkey Creek. Clements said that in 2003, the year of the taking, very little property was zoned M-3

like Glacier's property, implying higher demand. He also indicated that $4 per square foot was comparable to sales for pad sites similarly zoned. He valued Lot 3 at $3,558,000 as of the date of the taking and the total subject property at $4,518,602.

Ed Elder, a commercial real estate broker, also testified on behalf of Glacier. In Elder's opinion, the highest and best use of the property was a combination of industrial and some "flex-type" development. He explained that manufacturing, distributing, and a showroom could be combined under one roof, with "just a smidge of retail." Elder could envision several companies existing under one roof on the subject property. He found the property's visibility highly significant. In addition, like Clements, Elder thought proximity to downtown Kansas City, Missouri, important. The flexibility of M-3 zoning was another positive factor in his analysis.

Elder primarily focused on the market data approach in valuing the property. In examining comparable sales, he placed a value of $2 per square foot on the Glacier property and calculated the total fair market value, as of the date of the taking, to be $4 million.

Glacier's third expert, Jerry Job, an industrial real estate appraiser, opined that the highest and best use of the building on Lot 1 would be industrial, and the highest and best use of the land on Lot 1 would be an industrial office/warehouse. As for Lot 3, Job testified that its highest and best use would be to develop it as "flex space" or as an industrial office/warehouse space.

Job used the market data approach and the income approach in valuing Lot 1. Because the building on Lot 1 had been demolished before Job appraised the property, he used photos and leases associated with the building to assist him. Job testified that the building had a fair market value of $375,000. As for the two billboards on the property, he valued them at $855,000. For Lot 3, Job examined 13 comparable sales and calculated a value range between $2.11 and $2.37 per square foot. Applying those numbers, Job selected a mid-range figure of $3,175,000 for that parcel. These estimates led to a total fair market value for the subject property of $4,657,000.

The jury ultimately determined that the fair market value of the subject property "immediately prior to the date of taking on August 13, 2003," was $800,000.

## ANALYSIS

### Admission of Purchase Price Evidence

Glacier first argues on this appeal that the district court erred by admitting into evidence the prices Glacier paid for the two parcels of the subject property in 1995 and 1996. In Glacier's view, the purchases were too remote in time to make the prices relevant. In the alternative, Glacier argues that the COVs did not qualify as admissions against interest or prior inconsistent statements.

We have frequently recited this court's standard of review of evidentiary issues in eminent domain cases:

"Eminent domain is not a civil action but rather a creature of statute. Those exercising the right of eminent domain 'shall exercise such right in a manner set forth in K.S.A. 26-501 to 26-516, inclusive.' K.S.A. 26-101. The major issue in a condemnation action is the condemned property's fair market value. 5 Nichols on Eminent Domain § 18.05[1] (3d ed. 1997). Thus, any competent evidence bearing upon market value generally is admissible including those factors that a hypothetical buyer and seller would consider in setting a purchase price for the property. 5 Nichols, § 18.05[1]. Considerable discretion is vested in the trial court in admitting or rejecting evidence of value, and the latitude accorded to the parties in bringing out collateral and cumulative facts to support value estimates is left largely to the discretion of the trial court. 5 Nichols, § 18.05[1]." *City of Wichita v. Eisenring*, 269 Kan. 767, 773-74, 7 P.3d 1248 (2000).

See also *City of Shawnee v. Webb*, 236 Kan. 504, 511, 694 P.2d 896 (1985) (applying abuse of discretion standard).

In permitting the purchase price evidence, the district court judge in this case stated:

"[T]he fact of the matter is, if you buy a piece of property for 50 bucks and eight years later you're contending it's worth 4 million, then I think that that can become relevant. And what do you attribute that to?

"Now, it might come out to the jury and they say it's very reasonable. He did this, and he did that, and he's got experts now saying it's worth all this money. So that almost to me makes—the wide disparity between the valuations of the opinions, the valuations and so forth, is what leads me to allow in that form in '96, the purchase price. And certainly the admission against interest or admissions against interest by the landowner."

All relevant evidence is admissible under K.S.A. 60-407(f), unless subject to a statutory or other rule of exclusion, see *Mooney v. City of Overland Park*, 283 Kan. 617, 620, 153 P.3d 1252 (2007);

*Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 451, 124 P.3d 57 (2005); *City of Wichita v. Sealpak Co.*, 279 Kan. 799, 802, 112 P.3d 125 (2005). The time of a previous sale is always a consideration in ascertaining whether a sale is admissible evidence in a condemnation case. See 5 Nichols on Eminent Domain § 21.02[2] (3d ed. rev. 2006). "Sales of property must be recent enough in time to provide good evidence of the fair market value of condemned land. This is true no matter how similar the properties are in all other respects." 5 Nichols on Eminent Domain § 21.02[2].

"The first issue to be resolved concerning the admissibility of a sale or purchase of the subject property is the date of the sale or purchase. In order to render such evidence admissible, one must show that the purchase occurred recently and that values in the area have not changed since the purchase. A remoteness objection may well defeat the admission of this evidence." 7A Nichols on Eminent Domain § 9A.04[2][d] (3d ed. rev. 2006).

See also *State ex rel. Symms v. Collier*, 93 Idaho 19, 22, 454 P.2d 56 (1969) (sales price admissible if recent and voluntary; parties were willing and able to protect own interests; no major changes in conditions since sale); *St. Toll Hwy. Auth. v. Gr. Mandarin Rest.*, 189 Ill. App. 3d 355, 362, 544 N.E.2d 1145 (1989) ("When a parcel of land is condemned, the purchase price paid by the owner is a fact which may be considered in determining its value, provided the sale was recent and a voluntary transaction, with no changes in conditions or marked fluctuations in values having occurred since the sale."); *Bern-Shaw v. Baltimore*, 377 Md. 277, 303, 833 A.2d 502 (2003) (price paid by landowner not admissible if too remote to be relevant); 5 Nichols on Eminent Domain § 21.01[2] (price owner paid a most important piece of evidence in determining present value if three conditions met: [1] sale was recent; [2] voluntary transaction between parties capable and desirous of protecting own interests; and [3] no change in conditions or marked fluctuation in value has since occurred).

Glacier relies on *Love v. Common School District*, 192 Kan. 780, 391 P.2d 152 (1964), to support its contention that the amounts in the COVs should not have been admitted into evidence because they were too remote in time.

In *Love*, property was taken by the condemnor in 1961. A county real estate appraiser was permitted to testify, over objection, about a 1958 "market value" placed on the property for tax purposes by an appraisal firm from Lincoln, Nebraska. The witness merely read from cards on file in the county assessor's office, which he had not personally prepared. He admitted that he had never owned or sold real estate in the vicinity and did not know independently what the market value of the property would be.

The *Love* court held that this testimony was erroneously admitted for two reasons. First, it was hearsay because the county assessor had not personally appraised the property and was not the person whose opinion was being admitted; no one from the Nebraska appraisal firm was present or available for cross-examination. In addition, the court stated: "The assessed valuation was concededly not the true money value of plaintiff's property." 192 Kan. at 783.

The second reason the *Love* court determined the testimony was improperly admitted related to the remoteness issue before us in this case. Because the property was taken in 1961, while the appraisal was made in 1958, admission of the 1958 value violated the long-established rule that "land taken by condemnation is to be valued as of the date of the taking." 192 Kan. at 783 (citing *Wier v. St. L., Ft. S. & W. Rld. Co.*, 40 Kan. 130, 140, 19 Pac. 316 [1888]).

"This principle is too well established to require further elaboration. It is sufficient to say that *evidence of the value of plaintiff's property in 1958 would not be competent to establish its value in 1961* under the circumstances of this case, where improvements to plaintiff's property had been added after 1958, and where there was a total lack of evidence by means of which its value in 1958 could be compared with its value in 1961." (Emphasis added.) 192 Kan. at 783-84.

The *Love* court went on to say that one would have to "ignore human realities" to conclude that the appraisal did not affect the jury's verdict. 192 Kan. at 784.

KDOT responds that *Love* does not prohibit admission of prior assessments or sale prices of condemned property. Instead, the question of whether a sale is too remote in time should merely be considered in the exercise of the district court's discretion on the

evidentiary question. In addition, KDOT stresses that the tax assessment figures presented in *Love* are distinct from the purchase prices at issue here. In *Love*, the county assessor and the witness had no personal knowledge of the property's worth. The COVs at issue here were required to be completed by the buyer, the seller, or an agent of either. See K.S.A. 79-1437c. They provided information about actual sales, as well as whether they occurred at arms' length and in an open market. In this case, the COV for Lot 1 was signed by the seller, and the COV for Lot 3 was signed by Dean as manager of Glacier.

Other than *Love*, we have had few cases addressing the issue of admission or exclusion of a landowner's purchase price in a condemnation case. In *State Highway Commission v. Lee*, 207 Kan. 284, 485 P.2d 310 (1971), *superceded by statute on other grounds City of Wichita v. Eisenring*, 269 Kan. 767, 7 P.3d 1248 (2000), we acknowledged the general rule regarding admissibility of a purchase price of condemned property and ultimately determined a district judge did not abuse his discretion by excluding such a price when it was paid for two tracts of land nearly 2½ years before the taking. The value of property in the vicinity of the condemned land had changed substantially in the intervening period, including development of residential subdivisions, opening of a large retail shopping center, and construction of the Kansas State University football stadium and three major apartment complexes. 207 Kan. at 292; see also *Humphries v. State Highway Commission*, 201 Kan. 544, 548, 442 P.2d 475 (1968) ("[S]ale price, as opposed to an appraiser's opinion of *value* of property for tax purposes, if not remote in time, is a proper inquiry on cross-examination.").

Here, we are faced with a lapse of 7 and 8 years between Glacier's purchases of the subject parcels and the taking. Courts in other jurisdictions have held either that there was no abuse of discretion in excluding similarly remote sales or that there was an abuse of discretion in admitting them. See, *e.g., City of Chicago v. Lederer*, 274 Ill. 584, 588, 113 N.E. 883 (1916) (court erred in admitting deed for purpose of proving purchase price more than 7 years before petition filed in condemnation case; too remote to have any legitimate bearing on value of land); *New Jersey Highway*

*Authority. v. Rudd*, 36 N.J. Super. 1, 114 A.2d 721 (1955) (court did not err in refusing to permit broker who negotiated sale to state purchase price from 7 years before taking); *Ornstein v. Chesapeake & O.R. Co.*, 26 Ohio L. Abs. 78, 11 Ohio Op. 129, 36 N.E.2d 521 (1937) (landowner's testimony on cross-examination regarding purchase price 8 years before condemnation "would not have been competent" in case-in-chief because too remote; court did not err in refusing to admit cancelled checks to corroborate landowner's testimony); *Sullivan v. M., K. & T. Ry. Co.*, 26 Tex. Civ. App. 429, 433, 68 S.W. 745 (1902) (evidence of purchase price from 10 years before taking incompetent, even though evidence indicated market value remained unchanged); *West Virginia Dept. of Highways v. Mountain*, 167 W. Va. 202, 207-08, 279 S.E.2d 192 (1981) (where 4½ years elapsed between landowner's purchase of property and taking, error to admit evidence of purchase price; substantial change in physical characteristics of property had occurred). Yet there also are cases from other jurisdictions holding the opposite. See, *e.g., Dickinson v. United States*, 154 F.2d 642 (4th Cir. 1946) (6-year-old purchase price; time went to weight, not admissibility, of evidence); *Love v. United States*, 141 F.2d 981 (8th Cir. 1944) (7-year-old purchase price; admissibility of deed evidencing purchase price within trial court's discretion); *State v. 0.0673 Acres of Land, Etc.*, 224 A.2d 598, 601 (Del. 1966) (10-year-old purchase price; purchase price an element of value); *State v. Johnson*, 287 S.W.2d 835, 837 (Mo. 1956) (5-year-old purchase price; property values in vicinity increased since purchase; purchase price not too remote in time). In Pennsylvania, one court has observed that the line between too remote and not too remote appears to fall somewhere between 7 years and 9 years. See *Klick v. Dept. Transportation*, 20 Pa. Commw. 627, 632, 342 A.2d 794 (1975) (evidence of purchase price has been admitted if sale 3 years to 7 years before condemnation, while evidence of purchase price 9 or more years before inadmissible).

In addition to remoteness in time, Glacier argues that "significant improvements" or investments in the property along with "considerable economic change" made the 1995 and 1996 purchase prices irrelevant or, if relevant, unduly prejudicial. It ob-

serves that in *Sealpak*, 279 Kan. at 806, this court, citing *Love*, acknowledged that "property improvements occurring between two valuation times can be a basis for excluding the earlier valuation." We also recently decided *Mooney*, 283 Kan. 617, in which we upheld a district judge's decision to exclude evidence of the price in an earlier sale of a small, unimproved corner portion abutting the improved 1-acre tract at issue in a condemnation proceeding. We agreed the sale of the corner was too dissimilar to the 1-acre tract to be relevant. *Mooney*, 283 Kan. at 621.

Glacier enumerates the following improvements between the purchases of the parcels and the taking at issue here:

- Grading and leveling of the property for development and building;
- Earth moving and land overhaul to enhance development potential, including road improvements;
- Engaging engineers and architects to provide impact studies, probability reports, and surveys;
- Engaging engineers to work with the U.S. Army Corps of Engineers to plan remedies for flooding, noting that the federal government approved funding in excess of $25 million for flood remediation and relief in the area;
- Expending funds for legal services associated with the property; and
- Capital improvements and renovations to the building on Lot 1.

Although KDOT's experts did not necessarily assign much appreciation in the property's value to intervening improvements, they certainly acknowledged that the improvements were accomplished. In addition, KDOT's brief does not appear to dispute that economic change occurred as well. Its position appears to be simply that Glacier had ample opportunity at trial to explain the effect of these improvements and investments and any economic change to the jury and thus ameliorate the admission of the 1995 and 1996 prices. These factors, according to KDOT, go to weight rather than admissibility of the purchase price evidence.

We have recently observed in several other contexts that a district court's exercise of discretion in admitting and excluding evi-

déñce is circumscribed by governing law. See *State v. Gunby*, 282 Kan. 39, 47-48, 144 P.3d 647 (2006) (adequacy of legal basis for judge's admission of evidence reviewed de novo); *State v. Gonzalez*, 282 Kan. 73, 80-81, 145 P.3d 18 (2006) (admission of hearsay governed by statute; review requires interpretation of statute, a question of law). This is no less true in the condemnation context than in any other litigation. See *Mooney*, 283 Kan. at 619-20. And it is no less true when a court decision rather than a statute sets forth the governing law.

In this case, our decision in *Love* was the governing law limiting the district court's exercise of discretion on admission and exclusion of the purchase prices for the Glacier parcels. That opinion demonstrated that the prior value of the subject property must be closely related in time and circumstance to the only question before the jury—the fair market value of the land at the time of the taking—to qualify as relevant and admissible. They were not, and we hold that admission of the 1995 and 1996 purchase prices was an abuse of discretion and error. Even if the prices were not remote in time and further separated from the taking by changes in the condition of the land and the economy, we note that they were insufficient as unadjusted to present value, and they were not used as true comparable sales by KDOT's experts. Shaner's testimony on their negligible effect was especially telling in this latter regard. See *Bern-Shaw*, 377 Md. 277 at 292-96 (18-year-old purchase price, unadjusted to present value, not relevant for jury to consider in its fair market valuation); *Love*, 192 Kan. at 783-84 (improvements between two valuation times can be basis for excluding earlier property valuation).

Having determined there was error, we must next address whether the error was reversible.

"No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or for setting aside a verdict . . . , unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." K.S.A. 60-261.

For a jury verdict to stand, it must be supported by the testimony. A jury is entitled to consider all the evidence, not just that

from one witness. *Kansas State Highway Commission v. Roepke,* 200 Kan. 660, 664, 438 P.2d 122 (1968) (upholding a jury verdict in a condemnation action because the jury's verdict was within the range of values given by both parties' experts); *cf. City of Wichita v. May's Company, Inc.,* 212 Kan. 153, 156, 510 P.2d 184 (1973) (reversing the jury's award in a condemnation proceeding because it was not within the range of value established by the testimony). In this case, the jury had several expert opinions to consider during its deliberations. Those experts testified to a wide range in value from $463,000 to $4,657,000. The purchase price was well below the range of values offered by either party's experts. The jury's award, however, is within the range of values offered by the experts. Because there is sufficient evidence other than the purchase price to support the jury's award, the error in admitting the purchase price did not affect Glacier's substantial rights. As a result, the error was harmless.

*Continuance*

Glacier contends the district court erred in refusing its motion to continue the jury trial, which was scheduled to begin on June 13, 2005. On June 9, 2005, the district court ruled that the purchase price of the property was admissible evidence. On June 10, 2005, Glacier filed a motion requesting to continue the trial for the purpose of conducting additional, extensive discovery "to demonstrate and prove these new requirements set forth by the Court's ruling." The district court denied the motion after hearing arguments on the matter.

Our standard of review on motions for a continuance is well-settled: the district court's ruling will not be disturbed absent an abuse of discretion. *State ex rel. Stovall v. Meneley,* 271 Kan. 355, 382, 22 P.3d 124 (2001). "Judicial discretion is abused only when no reasonable person would take the view adopted by the trial court." 271 Kan. at 368.

Glacier argues that the continuance was necessary to provide additional time for conducting discovery and developing a strategy to mitigate the extremely prejudicial effect of the admission of the purchase price. Glacier argues that it needed additional time to

show a significant rise in the property value since the land was purchased based on the land's "worth" in 1995/1996; the substantial improvements and investments associated with the property; and the economic changes in the vicinity of the property. Glacier further argues that it needed additional time to consult with numerous experts regarding (1) improvements made to the property and their effect on its value; (2) expenditures made by Glacier in developing the property; (3) the inherent risk taken by Glacier at the time it purchased the property; (4) the positive effect from the appropriation of federal funding for the Turkey Creek Flood Control Project; (5) the appreciation of the property; and (6) the effect of inflation and other economic changes.

The day before Glacier filed its motion for a continuance, the parties filed a pretrial order that had been approved by counsel for both parties and signed by the trial judge, stating in pertinent part:

"9. Trial Setting: This action is scheduled to be tried to a 12-person jury commencing on June 13, 2005, at 9:00 a.m. Counsel shall be present at 8:30 a.m. Trial is scheduled for 10 consecutive days. *No continuances shall be granted except in the case of extreme and unforeseen emergency.* This Pretrial Order shall govern the future course of this matter, and shall only be altered by future order of the Court." (Emphasis added.)

Pursuant to K.S.A. 60-216(e), pretrial orders may be modified only by agreement of the parties or by order of the court to prevent manifest injustice. Because K.S.A. 60-240(b) gives a district court authority to "continue an action at any stage of the proceedings upon such terms as may be just" if it finds good cause for the motion, our analysis turns on whether the district court abused its discretion in determining that Glacier's motion was not supported by "good cause." Glacier bears the burden of establishing that it was prejudiced by the district court's decision. See *State v. Ly*, 277 Kan. 386, 389, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004).

Glacier filed its motion for a continuance after 2 years of discovery, a pretrial conference, and two pretrial motion hearings. We believe that the parties to this action had ample opportunity to prepare for trial and present their evidence to the jury. In addition, we note that Glacier presented evidence regarding all of the improvements made to the property, the engineering and architec-

tural studies related to the development of the property, the Turkey Creek Flood Control Project, and three expert opinions concerning the value of the property based on these various factors.

Glacier has failed to demonstrate any prejudice from the district court's denial of its motion for a continuance. Thus, we conclude that the district court did not abuse its discretion when it denied Glacier's motion for a continuance.

*Exclusion of Value Engineering Study Evidence*

Glacier claims that the district court erroneously excluded evidence of a "value engineering study" conducted on behalf of KDOT in 2001. According to Glacier, the engineering study valued Glacier's property in excess of $3.5 million. Glacier asserts that the report constituted an admission against interest.

Relevance is our first consideration when examining the district court's decision to exclude evidence. *Sealpak,* 279 Kan. at 802. In general, all relevant evidence is admissible. K.S.A. 60-407(f); *Griffin v. Suzuki Motor Corp.*, 280 Kan. 447, 451, 124 P.3d 57 (2005). K.S.A. 60-401(b) defines "relevant evidence" as "evidence having any tendency in reason to prove any material fact."

In 2001, KDOT contracted with Ventry Engineering to perform a study for the reconstruction of I-35 in the area near Glacier's property. Ventry Engineering generated a report entitled: "Value Engineering Study of I-35 Reconstruction SW Boulevard to State Line Project No. 35-105K6391-01 Lenexa, Kansas." The study contained dollar value estimates for the cost of acquiring land along the proposed I-35 reconstruction project. Although Glacier's land was not specifically identified, it appears to have been included as part of the property that Ventry Engineering anticipated KDOT acquiring to complete the project. The study applied a constant cost of $27 per square meter to all of the right-of-way property, regardless of its location or characteristics. The study projected the cost of obtaining all of the necessary property from Mission Road to a point beyond Seventh Street, including the cost to acquire other properties and buildings besides Glacier's property. Based on the square footage of Glacier's property, Glacier attempted to

use the $27 figure to calculate an estimated value in excess of $3.5 million.

In denying Glacier's request to admit the study, the district court found, *inter alia,* that the report included "all kinds of different property, and not the subject of this lawsuit." Based on that finding, the district court concluded that it would be unfair to admit the $27 per square meter estimated cost for acquiring the property needed for the project. In addition, the court concluded that the study was not an admission against interest.

Glacier asserts that, under *Sealpak,* 279 Kan. 799, it should have been permitted to introduce the value engineering study as KDOT's admission against interest in light of the fact that KDOT's two appraisal experts at trial valued Glacier's property at $463,000 and $530,000, respectively. The *Sealpak* court held that out-of-court statements made by the landowner, which were inconsistent with his valuation position at trial, were relevant and admissible as admissions against interest. 279 Kan. at 802; see also *Avery v. City of Lyons,* 181 Kan. 670, 673, 314 P.2d 307 (1957) (error to exclude personal property tax assessment sheets given to county clerk by owner of store building later damaged by fire); 5 Nichols on Eminent Domain § 18.12[1] (because owner's admission against interest is not conclusive but, rather, constitutes substantive evidence of value, owner is free to introduce evidence in explanation of circumstances attending the admission).

We can distinguish the facts of this case from those in *Sealpak.* The value Glacier sought to introduce from the study originated with Ventry Engineering, not KDOT. The purpose of the study was to compare engineering alternatives. Although Ventry Engineering included theoretical costs in the study, the report contained no support for any of these theoretical costs. KDOT was not voicing an opinion regarding the specific value of Glacier's property through the study. In contrast, it was the owner of the property who provided an inconsistent valuation for the property to local taxing authorities in *Sealpak.* Furthermore, admissions by a condemning authority include "appraisals of the property prepared and adopted for purposes *other than* acquisitions, negotiations or condemnation." (Emphasis added.) 5 Nichols on Eminent Domain

§ 18.12[2] Thus, the estimate prepared by Ventry Engineering does not qualify as an admission by KDOT even if KDOT had adopted the estimate generated by Ventry Engineering.

Moreover, the author of the statement, *i.e.*, the engineers who authored the Vestry Engineering report, were not called to testify at trial and were not subject to cross-examination. In *Sealpak*, the owner was a party to the lawsuit and subject to cross-examination regarding his inconsistent valuation statements.

Even though the study was not an admission against interest, it is admissible if it is relevant and not precluded by some other evidentiary rule. See K.S.A. 60-407(f). However, we conclude that the evidence does not pass the test of relevance. The engineering study was conducted to evaluate the engineering alternatives rather than determine the value of Glacier's property. The study included property from a large area along I-35 without limiting its analysis to Glacier's property and without specifically identifying Glacier's property. In addition, the authors of the engineering study provided no support or rationale for the average cost per square meter. Because the evidence was not relevant to the issue of valuing Glacier's property, we affirm the district court's decision to exclude the evidence.

*Deposition*

At a pretrial hearing, KDOT announced its intention to introduce evidence at trial regarding a lawsuit brought in 2000 against Glacier and Dean, its owner, by Gregory, Steven, and Diana Short. The Shorts formerly owned a 50 percent interest in Glacier with Dean, who owned the remaining 50 percent. KDOT argued that evidence of a settlement in the lawsuit was relevant to establish the alleged value of the property at or near the date of the taking. Approximately 1 week before trial, KDOT filed a notice to take Gregory Short's deposition to preserve his testimony for trial because he would be out of the country during the scheduled trial. Short's deposition indicated that Dean performed a cash buyout of the Shorts' 50-percent interest for $200,000. The parties' settlement agreement also contained the following provision:

"Valuation: Each party relies upon their own valuation of Glacier and not upon any representation of the other. Each party shall bear the risk that the value of Glacier may change in the future. *No representations are being made on the issue of valuation.*" (Emphasis added.)

Glacier argues the district court erred in refusing to quash Short's videotaped deposition. Glacier complains that, although Short's testimony was never actually presented at trial, the district court's refusal to quash the deposition effectively barred Dean from offering his opinion regarding the value of the property at the trial.

As with all forms of discovery, the district court has broad discretion in allowing depositions. K.S.A. 60-230(a)(2); *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 704, 952 P.2d 1286 (1998). The district court's orders regarding discovery will not be overturned on appeal absent an abuse of the district court's discretion. 263 Kan. at 704. The appellant bears the burden of establishing that the district court abused its discretion. 263 Kan. at 706.

Glacier does not argue that Short's deposition testimony was irrelevant. Rather, Glacier's argument is limited to the effect of Short's deposition testimony on its trial strategy. Glacier fails to cite any authority to support its proposition that an opposing party should be denied the opportunity for discovering and preserving relevant evidence merely because its discovery or preservation would negatively impact the complaining party's trial strategy. On the contrary, K.S.A. 60-226(b)(1) allows parties to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." K.S.A. 60-226(b)(2) instructs the court to allow discovery unless

"(A) The discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome or less expensive; (B) the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought; or (C) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation and the importance of the proposed discovery in resolving the issues."

Considering this broad policy for allowing discovery, we find no abuse of discretion in the district court's decision allowing KDOT to take Short's videotaped deposition to preserve his testimony.

*Trial Proceeding*

Finally, Glacier takes issue with the district court's decision regarding the sequential order in which the parties presented evidence in the trial proceedings. The district court allowed KDOT to proceed as the plaintiff by delivering its opening statements first, presenting its evidence first, asserting its closing arguments first, and ending the proceedings with the final closing argument. Glacier complains that it was severely prejudiced by the district court's procedure and argues that it should have been allowed to proceed as the plaintiff.

The resolution of this issue requires the interpretation of statutes related to condemnation proceedings and the Code of Civil Procedure. Because the interpretation of a statute is a question of law, we apply an unlimited standard of review. *Miller v. Bartle*, 283 Kan. 108, 113, 150 P.3d 1282 (2007).

The procedures for an eminent domain action are controlled by statute. K.S.A. 26-501(a); *In re Condemnation of Land v. Stranger Valley Land Co.*, 280 Kan. 576, 577, 123 P.3d 731 (2005). An eminent domain action is initiated by filing a verified petition in the district court in the county where the land is situated. K.S.A. 26-501(b). The plaintiff is the condemning authority. See K.S.A. 2006 Supp. 26-504; K.S.A. 26-507. Either party may appeal the appraiser's award pursuant to K.S.A. 2006 Supp. 26-508, which provides:

"If the plaintiff, or any defendant, is dissatisfied with the award of the appraisers, such party, within 30 days after the filing of the appraisers' report, may appeal from the award by filing a written notice of appeal with the clerk of the district court . . . . In the event any parties shall perfect an appeal, copies of such notice of appeal shall be mailed to all parties affected by such appeal, within three days after the date of the perfection thereof. An appeal by the plaintiff or any defendant shall bring the issue of damages to all interests in the tract before the court for trial *de novo. The appeal shall be docketed as a new civil action, and . . . . the appeal shall be tried as any other civil action.* The only issue to be determined therein shall be the compensation required by K.S.A. 26-513, and amendments thereto. " (Emphasis added.)

Although the Eminent Domain Procedure Act, K.S.A. 26-501 *et seq.*, identifies the parties to the initial eminent domain proceed-

ing, it specifically provides that an appeal is to be considered a new civil action. K.S.A. 2006 Supp. 26-508. Because K.S.A. 2006 Supp. 26-508 does not identify the parties to the new civil action, we look to the Code of Civil Procedure to determine the identity of the parties in the appeal. As a general principle regarding the application of the Code of Civil Procedure to eminent domain appeals, this court has held that the appeal should be conducted as any other civil trial unless a provision of the Code of Civil Procedure counteracts or contravenes the nature of the Eminent Domain Procedure Act, in which case the particular statute from the Code of Civil Procedure will not be applied. *Landau Investment Co. v. City of Overland Park*, 261 Kan. 394, 409, 930 P.2d 1065 (1997) (applying K.S.A. 60-215(a) in allowing amendment of description of property in the petition); see also *Shay v. Kansas Dept. of Transportation*, 265 Kan. 191, 195, 959 P.2d 849 (1998) (applying K.S.A. 1997 Supp. 60-216 and K.S.A. 1997 Supp. 60-237 to issue of dismissing condemnation appeal as sanction for failure to comply with discovery order); *City of Wellington v. Miller*, 200 Kan. 651, 438 P.2d 53 (1968) (invalidating the application of K.S.A. 60-241 to eminent domain appeals).

K.S.A. 60-202 identifies the parties to an action as follows:

"There shall be but one form of action to be known as 'civil action,' in which the party complaining shall be designated 'plaintiff' and the adverse party 'defendant.' "

K.S.A. 60-202 does not counteract or contravene the nature of the Eminent Domain Procedure Act. Thus, it applies in determining the identity of the parties to an eminent domain appeal. The party bringing the appeal is the complaining party or the "plaintiff," and the other party is the defendant. As a matter of custom, Kansas trial procedure allows the plaintiff to address the jury first in opening statements, present evidence first, and begin closing arguments. In addition, the plaintiff is allowed to finalize the trial process by presenting the final closing argument to the jury. Supreme Court Rule 168 (2006 Kan. Ct. R. Annot. 221). This custom is based on the fact that the plaintiff bears the burden of proof. We note that neither party bears the burden of proof in an eminent

domain appeal because each party has equal duty and responsibility to supply the evidence required by the statute. *City of Wichita v. May's Company, Inc.*, 212 Kan. 153, 157, 510 P.2d 184 (1973). However, we do not believe this distinction warrants a new trial procedure for eminent domain appeals. The legislature clearly stated that eminent domain appeals would be "tried as any other civil action." K.S.A. 2006 Supp. 26-508. Accordingly, we conclude that this custom does not counteract or contravene the nature of the Eminent Domain Procedure Act and should be applied in the trial of eminent domain appeals.

In this case, KDOT brought the appeal from the appraiser's award, so it is the plaintiff in the trial proceedings. Accordingly, the district court properly allowed KDOT to proceed as the plaintiff during the trial of this action.

Without analyzing the applicable statutes, Glacier argues that the landowner should always be considered to be the plaintiff in eminent domain trials. For support, Glacier quotes from 27 Am. Jur. 2d, Eminent Domain § 532, which states: "Many cases support the proposition that, in eminent domain proceedings in which the issue is the amount of the compensation or damages, the landowner-condemnee has the right to open and close the case." See also *City of Fort Lauderdale v. Casino Realty, Inc.*, 313 So. 2d 649, 653 (Fla. 1975) ("[A]ny doubt must be resolved in favor of the property owner and he must be granted the privilege to open and close in final argument."); *Phillips v. Southwestern Bell Tel. Co.*, 559 S.W.2d 464, 465 (Tex. Civ. App. 1977) (while right of condemnee to open and close jury argument in condemnation proceeding is highly important right, denial of such right does not require reversal; denial of right to open and close will justify reversal only upon showing of harm).

Glacier further relies on the Model Eminent Domain Code, which allows the defendant landowner to make the first opening statement, proceed first in the presentation of evidence on the issue of the amount of compensation, and make the final closing argument. See 27 Am. Jur. 2d, Eminent Domain § 532 (citing Model Eminent Domain Code § 903). The Comment to section 903 of the Model Eminent Domain Code provides:

"In eminent domain actions the normal position of the parties is reversed (*i.e.*, the property owner who is seeking an affirmative award of money appears as a defendant), and the issues are generally tried in a different order than other civil actions, thus warranting special treatment of these matters in the Uniform Code.

"Subsection (a) is consistent with the majority view in the United States that the property owner, in an eminent domain action, has the right to open and close, and may proceed first with the presentation of evidence on the issue of the amount of compensation. [Citation omitted.]. . .

"Under Subsection (a), the property owner is required to proceed first; however, nothing in the section precludes him from waiving an opening statement if he deems it tactically appropriate. Absent a waiver, however, the defendant must proceed first on all three aspects—opening statement, evidentiary presentation, and closing argument as well as to conclude it."

We note that our legislature has not adopted the Model Eminent Domain Code. Although Glacier encourages us to adopt it on behalf of Kansas, we decline to usurp the legislature's role in that regard. Because the statutory provisions set forth by our legislature clearly determine the identity of the parties in an eminent domain appeal, we find no merit in Glacier's arguments.

Affirmed.

LUCKERT, J., concurring: I agree with the outcome of this case and Justice Rosen's analysis on all issues except the question of the admissibility of the prices Glacier paid to purchase the two tracts of property in 1995 and 1996. I would find this evidence admissible.

As Justice Rosen notes, "any competent evidence bearing upon market value generally is admissible." *City of Wichita v. Eisenring*, 269 Kan. 767, 773, 7 P.3d 1248 (2000). Stated another way, any evidence relevant to market value on the date of the taking is admissible.

We recently discussed the rules relating to relevance in another eminent domain proceeding, stating:

"The City relies on precedent establishing the district court as a gatekeeper for the admission of comparable sales evidence, investing the district court with discretion to look at 'the factors of whether the sale was bona fide, voluntary, not too remote in point of time, and if the conditions of the property and surrounding area were sufficiently similar to those on the date of the taking [of the condemned property].' *Consultation, Inc. v. City of Lawrence*, 5 Kan. App. 2d 486, 488, 619

P.2d 150 (1980), *rev. denied* 229 Kan. 669 (1981). The district court 'has broad discretion in determining what evidence will be allowed in an eminent domain proceeding.' *U.S.D. No. 464 v. Porter*, 234 Kan. 690, 694, 676 P.2d 84 (1984). In essence, the initial district court inquiry is simply a determination as to the *relevance* of the proffered comparable sales evidence.

" 'Generally, when considering a challenge to a district judge's admission of evidence, an appellate court must first consider relevance. Unless prohibited by statute, constitutional provision, or court decision, all relevant evidence is admissible. K.S.A. 60-407(f). Evidence is relevant if it has any tendency in reason to prove any material fact. K.S.A. 60-401(b). To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are intended to establish. [Citation omitted.]

" 'Once relevance is established, evidentiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. [Citation omitted.]' [Citation omitted.]" *Mooney v. City of Overland Park*, 283 Kan. 617, 619-20, 153 P.3d 1252 (2007).

See also *City of Mission Hills v. Sexton*, 284 Kan. 414, 160 P.3d 812 (2007).

In this case, Justice Rosen attempts to move the question of relevance from the realm of discretion, albeit discretion guided by case law, to the second step of the analysis where our review is de novo. This leap is justified by relying on *Love v. Common School District*, 192 Kan. 780, 391 P.2d 152 (1964). In that decision the court determined:

"[E]vidence of the value of plaintiff's property in 1958 would not be competent to establish its value in 1961 under the circumstances of this case, where improvements to plaintiff's property had been added after 1958, and *where there was a total lack of evidence by means of which its value in 1958 could be compared with its value in 1961.*" (Emphasis added.) 192 Kan. at 783-84.

Justice Rosen interprets that holding as removing discretion from the trial court. Contrary to that conclusion, several discretionary components are embedded in the *Love* holding, including determining what length of time is too remote; whether there are substantial improvements or investments in the property; and, finally, the component which the other justices ignore, whether there is evidence providing the means for comparison of the values at the different times.

In listing these factors, *Love* did not establish any bright-line boundaries beyond which a trial court abuses discretion; in other words, no rules were established that would control the outcome of the trial court's application of the identified factors. For example, the court identified the remoteness of the sale as a factor. Yet, no rule was established as to when a sale is too remote. While *Love* dealt with a 3-year-old sale deemed too remote, the other justices cite cases where the admission of evidence regarding sales dating back 6, 7, and even 10 years was upheld. See, *e.g.*, *Dickinson v. United States*, 154 F.2d 642 (4th Cir. 1946) (6 years); *Love v. United States*, 141 F.2d 981 (8th Cir. 1944) (7 years); *State v. 0.0673 Acres of Land*, 224 A.2d 598 (Del. 1966) (10 years). As these cases illustrate, many factors can weigh in the determination of whether one sale is too remote while another is not. *Love* mentioned one such factor that made the holding case-specific: the "total lack of evidence by means of which its value in 1958 could be compared with its value in 1961." *Love*, 192 Kan. at 783-84. In contrast, a great deal of such evidence was introduced in this case that allowed the jury to compare the value at the time of purchase to the value at the time of taking.

In short, a trial court could apply the factors mentioned in *Love* and, given the difference in evidence presented regarding improvements, reach the conclusion the evidence should be admitted. Our standard of review was stated in *Dragon v. Vanguard Industries, Inc.*, 277 Kan. 776, 779, 89 P.3d 908 (2004), where we held that, generally, the trial court's decision is protected if reasonable persons could differ upon the propriety of the decision as long as the discretionary decision is made within and takes into account the applicable legal standards. An abuse of discretion may be found if the trial court's decision goes outside the framework of or fails to properly consider statutory limitations or legal standards. See *State v. Edgar*, 281 Kan. 30, 38, 127 P.3d 986 (2006); *State v. Richard*, 252 Kan. 872, 881-82, 850 P.2d 844 (1993).

In this case, the trial court did consider the factors discussed in *Love*. First, noting the passage of time since Glacier purchased the property, the trial court explained why under the circumstances of this case the evidence was probative. Next, the trial court com-

mented on evidence regarding the improvements to the property, *i.e.*, that Glacier "did this" and "did that." In essence, the trial court concluded the evidence of improvements could be weighed by the jury and, under those circumstances, the age of the sales went to the weight rather than the admissibility of the evidence. *Cf. State v. Walters*, 284 Kan. 1, Syl. ¶ 5, 159 P.3d 174 (2007) ("Determining whether evidence is too remote to be admissible rests within the sound discretion of the trial court. Mere lapse of time alone is not sufficient to deprive evidence of its probative value but goes to the weight of the evidence to be considered by the jury."). Again, the trial court properly considered the factors weighing on the decision to admit the evidence. The final conclusion fell within the broad discretion of the trial court. While reasonable people could disagree with the trial court regarding whether the evidence should be admitted, reasonable people could also agree. As such, it is inappropriate to find that the trial court abused its discretion. See *State v. Moses*, 280 Kan. 939, 945, 127 P.3d 330 (2006) ("Discretion is abused only when no reasonable person would take the view adopted by the district court.").

Finally, the trial court also found that the COVs were admissible as an admission against interest. The COVs provided information about the sales and were required to be completed by the buyer, the seller, or an agent of either. See K.S.A. 79-1437c. In this case, the COV for Lot 1 was signed by the seller and could not be considered a statement of Glacier. The Lot 3 COV, however, was signed by Dean as the manager of Glacier. The COVs reflected, in essence, what Glacier was willing to pay for the property on the open market at the time of purchase. In *City of Wichita v. Sealpak Co.*, 279 Kan. 799, 805, 112 P.3d 125 (2005), we held admissible the statements by defendant Sealpak's owner, in property tax proceedings, of the owner's opinions (1) regarding the property's value and (2) that the County's appraised value was "over market value." We noted that, under the holding in *Love*, the evidence might not be admissible if improvements had been made to the property between the property tax proceeding and the date of taking. 279 Kan. at 806. That distinction would not apply here because, as already noted, *Love* was based upon the lack of explanation re-

garding improvements. Here, there was considerable evidence regarding changes to the valuation, and the COVs could have been admitted as a declaration against interest. The jury could weigh that evidence against the evidence regarding improvements, the experts' valuations, and other evidence to determine the fair market value at the time of taking.

The evidence was probative and, in the trial court's discretion, admissible.

McFARLAND, C. J. and NUSS, J., join in the foregoing concurring opinion.

BEIER, J., dissenting in part: I agree with the decision of Justices Rosen and Allegrucci in all respects save one with consequences. The admission of the purchase prices reflected in the certificates of value (COVs) was not only error; it was reversible error. The wide disparity in expert values, the relative mites shown on the COVs, and the jury's ultimate valuation persuade me that the erroneous admission had unduly prejudicial impact. We are not cast members in "Wicked." We cannot defy gravity. I would reverse and remand for a new trial without the evidence of the parcels' purchase prices.

DAVIS, J., joins in the foregoing dissenting opinion.