No. 110,573

KANSAS CITY POWER & LIGHT COMPANY, A Missouri Corporation, *Appellant/Cross-appellee*, v. DANIEL E. STRONG, Trustee, or Any Successor Trustee, Under the DANIEL E. STRONG TRUST Dated March 11, 2008, as May Be Amended, *et al.*, *Appellees/ Cross-appellants*.

(359 P.3d 33)

Opinion filed August 28, 2015.

*Daniel L. McClain*, of The McClain Law Firm, LLC, of Kansas City, Missouri, argued the cause and was on the briefs for appellant/cross-appellee.

*John M. Duggan*, of Duggan Shadwick Doerr & Kurlbaum LLC, of Overland Park, argued the cause, and *Matthew L. Heffner* and *Charles R. Stinson*, of the same firm, were with him on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

STEGALL J.: In January 2012, Kansas City Power & Light Company (KCPL) condemned a power line easement bisecting two tracts of undeveloped agricultural land in southern Johnson County. The land was owned by the trusts for Daniel and Evelyn

Strong (the Strongs). The easement occupied approximately 12 out of a combined 460 acres. Court-appointed appraisers awarded the Strongs $96,465 in damages. The Strongs appealed. At trial, the jury awarded the Strongs $1,922,559 as compensation for the taking. KCPL then appealed directly to this court pursuant to K.S.A. 2014 Supp. 26-504.

· KCPL asserts three claims of error below. First, KCPL claims the district court erred in denying its repeated motions to exclude or strike the expert testimony evidence offered by the Strongs. KCPL argued below, and reprises the argument on appeal, that the evidence was inadmissible pursuant to K.S.A. 26-513(e). Next, KCPL alleges the district court improperly permitted the Strongs' experts to testify pursuant to an alternative, nonstatutory "development approach" without first laying a foundation that development of the property was imminent. Finally, KCPL claims the district court erred in admitting evidence regarding a 2004 option contract the Strongs entered into with a developer.

The Strongs cross-appealed from certain unfavorable evidentiary rulings, but because we find the lower court did not err in admitting any of the evidence KCPL objects to, we do not reach the issues raised by the Strongs' cross-appeal. As such, we affirm the jury award and the judgment of the district court below.

## FACTUAL AND PROCEDURAL BACKGROUND

### KCPL's Motion in Limine

Prior to trial, KCPL filed a motion in limine asserting numerous evidentiary challenges. Relevant to this appeal, the motion sought to exclude the opinion testimony of the Strongs' expert witnesses and any exhibits showing hypothetical subdivision plans. KCPL also sought to exclude from evidence a purchase option contract for the sale of the Strongs' property to R.H. Sailors, a developer. The district court granted the motion as to the option contract but denied KCPL's motion with respect to the Strongs' experts' opinions and exhibits.

*KCPL's Expert Testimony*

At trial, KCPL presented expert testimony from two appraisers—Laird Goldsborough and Kenneth Jaggers. Goldsborough testified that the property had a best and highest use of agricultural land with a speculative investment premium. He noted that "[s]peculative holding is the consideration that at some point in the future [the land] will likely be developed into something else." Goldsborough believed the property would eventually be developed. He testified that the speculative investment premium was worth more than the pure agricultural value of the land. Considering this, Goldsborough arrived at a precondemnation fair market value of $3,501,866.

In Goldsborough's opinion, the easement did not cause any damage to the property because it would not affect farming operations. Therefore, to arrive at his appraisal of the land after the taking, he simply subtracted the value of the taken acreage. In Goldsborough's opinion, the easement reduced the value of the Strongs' land by $94,678.

KCPL's second expert, Kenneth Jaggers, produced similar testimony. Like Goldsborough, Jaggers valued the land as agricultural property with an investment premium due to the likelihood of development at some point in the future. Jaggers used comparable sales of similarly situated properties—agriculture property with speculative value—to determine the fair market value of the land prior to the taking. Jaggers testified he did not compare sales of farmland with no speculative value, explaining, "I'm sure no farmer would buy [the Strongs' land] solely to farm" and that any buyer would do so on a speculative basis. Based on these comparable sales, adjusted for size, location, and other factors, Jaggers testified the pre-taking value of the land was a combined $4,744,300 for both tracts.

Again like Goldsborough, Jaggers opined that "there was no diminution in value to the subject property after acquisition of the easement" and the easement caused no damage to the remainder of the property. Deducting the acreage affected by the easement from his calculations, Jaggers testified that the post-taking value of

the property was $4,615,900—amounting to a $128,400 loss suffered by the Strongs.

*The Strongs' Expert Testimony*

The Strongs built their case around the testimony of two experts—James Lambie and Troy Smith—and three exhibits (numbered 260-A, 260-B, and 260-C) showing a hypothetical concept development that could be built on the property. Exhibit 260-A demonstrated what a subdivision might look like without the KCPL easement while exhibits 260-B and 260-C depicted two alternative arrangements of lots accommodating the KCPL easement. Both exhibits 260-B and 260-C incorporated setbacks between the developed lots and the power lines. Daniel Strong testified that exhibits 260-A through C were prepared for trial and the subdivision was entirely hypothetical. He admitted the land had not been presented to any municipality for annexation.

Lambie is a homebuilder and developer in Johnson County. He testified that his opinions were formed as a developer, taking into consideration the factors a developer looking to purchase and build on the Strongs' land would consider. Lambie agreed that farm income alone would not be sufficient to economically justify paying fair market value for the Strongs' property. He said that in working up an offer to purchase land with an investment premium, a developer such as himself would utilize a concept plan tailored to the property such as contained in exhibits 260-A through C. According to Lambie, a developer wants to know, first and foremost, the available acreage for lot placement within any tract. He testified that utility easements always reduce such available acreage and that lots adjacent to power lines are always the last to sell. In fact, according to Lambie, such lots required a price discount of between 50 and 55 percent to sell. Lambie testified that if faced with 110-feet tall power line poles on a 70-foot wide easement, such as KCPL's, he would not develop lots all the way to the edge of the easement but would build in a sizable setback.

Lambie opined that from a developer's perspective, the value of the land prior to the taking was $15,000 per acre for a total fictional purchase price of $6.9 million. However, Lambie believed the

KCPL easement would reduce the amount a developer would be willing to pay for the land by $3,680,972 due both to the raw reduction in the aggregate number of lots and to the required discount factor that would be applied to some of the developed lots.

On cross-examination Lambie admitted that he was not an appraiser and that he was unfamiliar with appraisal techniques. In forming his opinions, he stated that he relied on the concept plans presented in exhibits 260-A through C. Lambie then stated that his damage calculation was not a true valuation but instead represented the amount of money a developer would require the Strongs to discount the selling price for their property as a result of the KCPL easement.

Further, Lambie admitted he was unfamiliar with Kansas statutes governing valuation of property in eminent domain cases. Lambie admitted that he did not realize that K.S.A. 26-513(e) required that fair market value be determined by the use of comparable sales, costs, or capitalization of income methods or any combination of these methods. In fact, Lambie admitted that he did not know what the capitalization of income method was, nor did he know how to perform a cost appraisal method. While Lambie did know the comparable sales method due to his experience as a realtor, he did not perform a comparable sales analysis on the property. Instead, Lambie stated that "I went by what I typically have paid for property in the ground and what I know I can pay to make the numbers work." He also stated that he did not take into account location, use of property, or natural features found on the property as opposed to other properties he had bought to develop. Finally, Lambie admitted his valuation was based upon the date of his report, January 2013, and not the date of the taking.

At this point, KCPL asked to approach the bench. KCPL's counsel moved to strike Lambie's testimony, arguing:

"I know the timing of this is a bit odd and I would ordinarily wait until I've concluded my cross, but I don't believe this expert is qualified to offer opinions regarding the valuation of this property in this case for several reasons.

"Number 1, he's admitted he's not competent and doesn't understand the appraisal requirements. Number 2, he's admitted that he didn't follow any of the three required methods specified by the Kansas statute. And last, there are two

parts in this case, two separate tracts of land. He made no attempt whatsoever to distinguish between the two.

"We believe it's required, when you submit this case to the jury, at that time they separately identify both tracts, the exact value for each tract, which he cannot do.

"So we believe that its appropriate to strike this expert's testimony."

After hearing arguments from counsel, the district judge ruled:

"All right, I'm not going to strike him at this juncture. All right. And I don't know all the evidence, both when we're done with him and all the examinations from both sides where we're going to stand.

"I also don't know what additional expert testimony or information is going to be provided by [the Strongs'] experts, whether it will tie things up or create a problem with respect to what the intent of the use of this testimony is. I mean, he's testified to a lot of things. So—some of which I think have a lot of bearing on this case.

"But I agree with you to the extent there are some concerns I have in terms of the scope and extent to which his testimony is intended to be used, but I don't know that until I hear all the evidence, so I'm not going to strike him."

Troy Smith was the Strongs' second expert. Smith is an appraiser and testified that he followed K.S.A. 26-513 to determine the value of the Strongs' property as of the taking. Smith opined that the highest and best use of the land was future single family residential development with an interim agricultural use. Smith testified this was consistent with the overall master plan of the surrounding municipalities, which informed his determination. Smith noted that farm income alone could never economically justify the fair market value of the property testified to by Jaggers. In Smith's opinion, the agricultural value of the property was simply an ancillary and interim benefit available for a limited time until the land could be developed as a single family residential subdivision.

During his direct examination, Smith testified that he spoke with Lambie and consulted Lambie's report in order to understand how a developer approaches purchasing agricultural land for future development. As Strongs' counsel began to question Smith about exhibit 260-A, KCPL objected. KCPL argued that Smith was relying on Lambie's opinions and Lambie had admitted he did not use a statutorily approved appraisal method to arrive at a fair market value of the land. KCPL also argued that Lambie had admitted the

hypothetical subdivision would not be built in the near future and thus exhibits 260-A through C and Smith's testimony were speculative and inadmissible.

After hearing from Strongs' counsel, the judge stated:

"THE COURT: The first issue. Essentially, as I understand, you're asking me to—to preclude [Smith] from testifying. I mean, you're not making an objection to his specific question, correct?

"[KCPL]: Your Honor, that's fair, at least to the extent he's relying on the unreliable Lambie analysis.

"THE COURT: All right. Well, I think, as [the Strongs] pointed out and consistent with my review of the law, first of all, starting from the statutes, it isn't exhaustive when you talk about the three approaches that are taken. And then what the Kansas Supreme Court, in terms of developmental use and how that fits squarely under the three approaches, to the extent it does or doesn't, the Supreme Court has at least allowed that concept to be utilized, again, depending upon the case and whether the situation warrants it.

"And so in terms of what I'm gathering, and I haven't had the benefit of reviewing the expert reports and their depositions as far as Mr. Smith, so I can't say with certainty where its going to go, but I think he—if he's qualified as an expert, once he's qualified in terms of what he utilizes, right or wrong, as an expert, unless it's absolutely baseless, then we're going into a different situation, but I think an expert once he's qualified in the field of condemnation, when you're talking about appraisals and evaluations of land values, I think he's got pretty broad range. And it's not for me to start picking apart what he should or should not be considering.

"So, again, I'm jumping ahead because I don't know all the testimony that's going to come in, and I'm not suggesting that if you got, as we're going through the testimony, a specific problem with something that's being asked based upon any factors that you think are improper, I'll entertain those, but I think at this juncture, as I understand that question posed to me and the issue, I'm not going to preclude him from testifying.

"So I think he's going to be allowed to testify."

Following the court's ruling, KCPL inquired as to the state of its motion to strike Lambie's testimony:

"[KCPL]: Your honor, based on your ruling, shall we presume that the nature of your ruling with respect to our motion to strike Mr. Lambie's testimony—remember, we made that motion at the side bar, and I guess I'm just wondering if we should continue to raise that—that motion at the end of the case or whether you've already forecast your ruling on that?

"THE COURT: Well, I didn't provide you with a ruling because it was made in the middle of his testimony, I think it was made in the middle of your examination of him.

"[KCPL]: Correct.

"THE COURT: Some of this is dependent upon how much of a record you want to make.

"I can't tell specifically because, again, you made an objection and it was a pretty broad objection. I would not expect there would be any dispute that a lot of his testimony would not be objectionable in terms of the scope and the relevancy. However, I don't know. It's for you to make the objection.

"From what I could gather reading between the lines, and we did it pretty, I think the thrust of your objection wanting to strike was not necessarily his entire line of questioning—

"[KCPL]: That is correct.

"THE COURT: —but dealing specifically with some of the valuations that he placed.

"[KCPL]: You hit the nail right on the head. As far as his knowledge of sewers and whatnot, I don't care. The focus of my objection is on his testimony establishing—purportedly establishing value for these tracts of the property.

"And the argument is, is that it's inherently unreliable and established with, I believe, cross-examination, and its speculative. It's not based on the approved factors authorized by the Kansas statutes, and therefore the jury should not have that information.

"[The Strongs]: That objection was waived when [KCPL] didn't make an objection when I laid the foundation and he testified on direct. You don't stand back and let somebody testify to all their evidence about their before and after values, and then after the fact say, oh, by the way, now that I know how he testified I want to move to strike. That's been waived, Judge.

. . . .

"THE COURT: All right. Well, here's what I think all of you should do is if you want me to revisit this matter beyond what I have already ruled upon, and I—to a degree, I indicated, you know, we can bring this back up, I didn't want to stop the process because I wasn't inclined to grant your motion at the time it was made anyway. But if you want to bring it up you can provide me—I think you framed the two big issues that both sides believe are in play, present me with the information that supports your position.

"The one thing I'll say, going back, as I was going over the case law and trying to familiarize myself with the scope of condemnation and what this trial was going to be all about, I think the Supreme Court in a variety of decisions at least invited—again, every case is going to be different, but in terms of a developmental aspect, if it could fit, based upon the evidence presented, I think at least the scope of that—and that's why originally in my motion in limine ruling I did not preclude the defendants from bringing in this evidence.

"And I think one of the aspects of your objection here may be more specific than the general context, but as we get into the developmental approach in the future, providing there is requisite foundation that has been laid so it's not entirely

speculative, then I think we're okay in allowing that frame of evidence to come in.

"Ultimately, whether Mr. Lambie is qualified to have offered the specifics of what he—that's partially a different question, but I think it falls under that subset of the context of the developmental approach, which is not a straight appraiser comparable. We're moving into a different area.

"So I think I'm looking at a lot of different contexts in trying to bring them together. So we can revisit this specifically, but I think you know where I'm standing right now as it is."

After this conference, the direct examination continued. Smith testified that in order to assess the fair market value of the property pre-taking, he used a comparable sales analysis, identifying sales of similar properties and adjusting for location, size, and other relevant factors. Using this methodology, Smith appraised the property at a fair market value of $4,442,730.

In order to arrive at a damage figure—the reduced value of the property post-taking—Smith testified that he applied a number of reductions and adjustments to the pre-taking fair market value based on the opinions of Lambie and his use of exhibit 260-C. Smith noted that 178 lots had been removed from the concept plan due to the easement. He testified that the setbacks in exhibit 260-C were necessary to ameliorate the negative impacts of the easement and make the overall development economically feasible. In addition to having fewer lots to build on, Smith testified the easement would negatively affect the development as a whole due to factors such as aesthetics, view, and neighborhood cohesion (*i.e.*, the easement would essentially cut any development in half). When discussing the economic discount necessary to account for these negatives, Smith testified that he conducted a comparable sales analysis using other residential lots near power line easements. Based on this, Smith opined that the typical discount would be between 25 and 30 percent, but he felt that 25 percent was a reasonable discount for this property.

Finally, Smith testified that he considered such overall factors as the impact the easement would have on the appearance of a subdivision, the impact on the view from the lots, and what factors a hypothetical purchaser, a developer, would consider when determining how much to offer to pay for the land after the power

lines were installed. The final result of this valuations process yielded an after-taking value of $2,775,404—approximately $1.67 million less than the land's pre-taking fair market value.

## The Sailors Contract

During KCPL's presentation of evidence, Richard Alexander, a senior planning engineer at Johnson County Wastewater, testified about sewer availability in the area of the Strongs' property. On cross-examination, the Strongs' counsel asked Alexander if he remembered discussing forming a sewer district with Sailors. KCPL immediately objected, citing the court's ruling on its pretrial motion in limine.

Upon hearing the objection, the district judge clarified his ruling, stating:

"There is I think two parts of the ruling that presently exist with respect to the R.H. Sailors contract. One was limiting any discussion to any cost, amounts offered, accepted, any of that. And I ruled upon that and that ruling still stands.

. . . .

"The other piece was the actual contract itself. And I said under the facts as presented, I don't think that contract should come in, and part and parcel was the price that was contained. And that was the extent of the ruling I made.

"And, you know, if [the Strongs' attorney is] going to get into discussions about topics with developers and being approached, again, I don't want to start suggesting to either of you what should or shouldn't be done, but I want to make it clear that, yes, we have a ruling that's in place, and it's going to stay in place unless somebody convinces me otherwise.

"But I don't think that the matter was that anything ever discussed between the Strongs and developer and the aspect of sewerability and sewers on the property is off limits because it's a big issue in this case. And it's already started, and I think it's going to continue."

Subsequently, the district court allowed the Strongs to elicit testimony from Alexander that Sailors was attempting to gain sewer access to the Strongs' property because Sailors had an option to buy and develop the land. The district court made it clear the contract itself, along with the dollar amounts therein, were inadmissible. The Strongs eventually elicited that between 2004 and 2007, Sailors had an option to purchase the Strongs' property and that such a purchaser could unilaterally form a sewer district.

Later, when Daniel Strong testified, he indicated that Sailors had previously purchased a different 240-acre tract owned by the Strongs. That tract had been annexed into the city of Spring Hill and developed. Strong testified that at the time Sailors purchased the Spring Hill tract, he also bought an option to purchase the land at issue here. Strong testified that in late 2006 or early 2007, Sailors was very interested in the Strongs' land due to the size and flexibility it offered to a developer. Strong testified that the deal fell through, however, due to a contract dispute. Neither the contract itself, nor its specific terms were admitted into evidence.

*The Jury Verdict*

The jury found the pre-taking fair market value of both tracts to be a combined $4,744,300. The jury then found the post-taking value of the remaining property to be $2,821,741, thus rendering a verdict in the Strongs' favor in the amount of $1,922,559. The various land valuations submitted to the jury, alongside the jury's actual verdict, are summarized in the chart below.

| Valuations Before and After the Taking (Tracts Combined) | | | |
|---|---|---|---|
| | Before | After | Difference |
| Initial Appraisal | $4,149,000 | $4,052,535 | $96,465 |
| Goldsborough (KCPL) | $3,501,866 | $3,407,188 | $94,678 |
| Jaggers (KCPL) | $4,744,300 | $4,615,900 | $128,400 |
| Lambie (the Strongs) | $6,900,000 | $3,219,028 | $3,680,972 |
| Smith (the Strongs) | $4,442,730 | $2,775,404 | $1,667,326 |
| Jury | $4,744,300 | $2,821,741 | $1,922,559 |

The district court memorialized the jury verdict in a journal entry, and KCPL immediately filed a supersedeas bond and obtained an order staying execution of the judgment pending appeal. This appeal followed.

## DISCUSSION

1. *Did the district court err in denying KCPL's various efforts to exclude the testimony of Lambie and Smith along with exhibits 260-A through C?*

*Standard of Review and Preservation*

KCPL first claims the "District Court Erred In Permitting The Strongs To Submit The Case On A Damage Theory That Did Not Use A Valuation Method Authorized By K.S.A. 26-513(e)." Essentially, KCPL takes the position that the Strongs did not submit any legally sufficient valuation evidence to the jury and, therefore, either the jury's verdict was unsupported by the evidence or the testimony of Lambie and Smith should have been excluded. In either case, the result would be the same—the jury would not be permitted to base its verdict on what KCPL contends is legally insufficient valuation evidence. As such, the question at the heart of this appeal is a purely legal question requiring us to interpret and apply K.S.A. 26-513. Our review of this question is unlimited. See *State v. Jolly*, 301 Kan. 313, 320, 342 P.3d 935 (2015) ("Statutory interpretation is a question of law over which this court has unlimited review."); *City of Wichita v. Denton*, 296 Kan. 244, 257, 294 P.3d 207 (2013) (challenge to the legal basis for admission of evidence is reviewed de novo).

As a threshold matter, the Strongs argue KCPL did not preserve its objections sufficiently to make this challenge on appeal. Our review of the record allows us to easily find that the issue was properly preserved. KCPL asserted this basic objection to the substance of the Strongs case throughout the proceedings. KCPL filed a motion in limine prior to trial, made motions to strike the testimony of Smith and Lambie, and filed a motion for judgment as a matter of law at the close of all evidence. The parties spend considerable energy debating whether a contemporaneous objection was lodged by KCPL to certain specific testimony; however, we need not wade into those waters because the essence of KCPL's objection was that the Strongs' evidence was legally insufficient. KCPL asserted this objection from the beginning of the case and carried it all the way through to the end. The purpose of the con-

temporaneous objection rule has been satisfied under these facts. See *State v. Gaona*, 293 Kan. 930, 956, 270 P.3d 1165 (2012) (contemporaneous objection rule is prudential in nature and not jurisdictional).

*Analysis*

To resolve this question, we must interpret and apply K.S.A. 26-513, which provides in relevant part:

"(c) *Partial taking.* If only a part of a tract of land or interest is taken, the compensation and measure of damages is the difference between the fair market value of the entire property or interest immediately before the taking, and the value of that portion of the tract or interest remaining immediately after the taking.

"(d) *Factors to be considered.* In ascertaining the amount of compensation and damages, the following nonexclusive list of factors shall be considered if such factors are shown to exist. Such factors are not to be considered as separate items of damages, but are to be considered only as they affect the total compensation and damage under the provisions of subsections (b) and (c) of this section. Such factors are:

(1) The most advantageous use to which the property is reasonably adaptable.

. . . .

(3) Appearance of the property remaining, if appearance is an element of value in connection with any use for which the property is reasonably adaptable.

(4) Productivity, convenience, use to be made of the property taken, or use of the property remaining.

(5) View, ventilation and light, to the extent that they are beneficial attributes to the use of which the remaining property is devoted or to which it is reasonably adaptable.

(6) Severance or division of a tract, whether the severance is initial or is in aggravation of a previous severance; changes of grade and loss or impairment of access by means of underpass or overpass incidental to changing the character or design of an existing improvement being considered as in aggravation of a previous severance, if in connection with the taking of additional land and needed to make the change in the improvement.

. . . .

(13) That the property could be or had been adapted to a use which was profitably carried on.

. . . .

"(e) *Fair market value.* 'Fair market value' means the amount in terms of money that a well informed buyer is justified in paying and a well informed seller is justified in accepting for property in an open and competitive market, assuming that the parties are acting without undue compulsion. The fair market value shall

be determined by use of the comparable sales, cost or capitalization of income appraisal methods or any combination of such methods."

KCPL claims the valuation methods used by Lambie and Smith to calculate the value of the Strongs' tracts after KCPL's taking was contrary to K.S.A. 26-513(e). The Strongs argue that the method utilized by Smith to arrive at his post-taking value is expressly permitted by K.S.A. 26-513(d) whereby the pre-taking fair market value is subject to downward adjustments based on a nonexclusive list of statutory factors. For reasons we discuss below, we find the Strongs' evidence was legally sufficient valuation evidence pursuant to K.S.A. 26-513 and was admissible.

Before looking directly at the statutory language, we note that certain factual aspects of this case are not in dispute. First, the evidence was overwhelming—and all the experts agreed—that the Strongs' property carried a significant investment premium over and above its value as agricultural land due to its development potential. Second, the sufficiency of the evidence supporting the jury's verdict with respect to the pre-taking fair market value of the property is not in dispute. KCPL's own expert, Jaggers, offered testimony—testimony unchallenged on appeal—that the pre-taking fair market value of the land was $4,744,300. The jury adopted Jaggers' opinion on the pre-taking fair market value as its own. Given this, the narrow issue presented here is whether the Strongs' evidence of post-taking value was legally sufficient pursuant to K.S.A. 26-513 to support the jury verdict.

The fundamental rule of statutory interpretation is the intent of the legislature is dispositive if it is possible to ascertain that intent. *State v. Looney*, 299 Kan. 903, 906, 327 P.3d 425 (2014). The language of a statute is our paramount consideration in ascertaining the intent of the legislature. 299 Kan. at 906. Where such language is plain and unambiguous, it is determinative of legislative intent. See *State v. O'Connor*, 299 Kan. 819, 822, 326 P.3d 1064 (2014).

K.S.A. 26-513(c), applicable to partial takings such as occur with utility easements, plainly creates a simple compensation formula with two variables: (1) the fair market value of the property pre-taking, less (2) the value of the remainder. The statute then defines

and describes the legally necessary evidence to prove up each variable. The first variable—the pre-taking "fair market value"—must be proved "by use of the comparable sales, cost or capitalization of income appraisal methods or any combination of such methods." K.S.A. 26-513(e).

It is significant that the second variable in subsection (c) does not use the term "fair market value" but rather speaks simply of the value of the remainder. We will not presume that this word choice was accidental. In fact, we presume the legislature deliberately chose the words used and intended those choices to convey a real meaning. See *Hays v. Ruther*, 298 Kan. 402, 406, 313 P.3d 782 (2013). Here, the words chosen by the legislature subject the first variable to K.S.A. 26-513(e) while leaving the second variable subject to adjustments pursuant to K.S.A. 26-513(d). There, the legislature defines and describes a nonexclusive list of factors which, if shown, can prove the reduced value of the post-taking remainder. The listed factors include the remaining appearance, productivity, convenience, use, view, and cohesion (*i.e.*, whether the remainder has been severed). An additional recognized factor—though not included in the legislature's nonexclusive list—is any evidence tending to show what a hypothetical buyer would consider in determining a purchase price for the property. See *City of Mission Hills v. Sexton*, 284 Kan. 414, 423, 160 P.3d 812 (2007) (quoting *City of Wichita v. Eisenring*, 269 Kan. 767, 773, 7 P.3d 1248 [2000]) (" '[A]ny competent evidence bearing upon market value generally is admissible including those factors that a hypothetical buyer and seller would consider in setting a purchase price for the property.' ").

Applying this statutory scheme to the record before us, we are convinced the Strongs' evidence was admissible and sufficient to support the jury's post-taking value determination. KCPL is essentially correct that Lambie was not a valuation expert. In other words, he expressly testified that he was speaking not as an appraiser using accepted fair market value appraisal techniques. Rather, Lambie testified that his opinions were those of a professional developer and hypothetical buyer asked to evaluate the Strongs' property for purchase. This evidence was certainly rele-

vant to the jury's consideration of the adjustment factors permitted by K.S.A. 26-513(d). More importantly, it laid the proper foundation for the testimony of the Strongs' true valuation expert—Smith.

Smith testified as an appraisal expert. He testified that he reached his post-taking valuation by applying a number of diverse adjustments to the fair market value of the pre-taking property. Smith's adjustments were supported by (1) comparable sales of similarly burdened property; (2) discount factors accounting for diminution of value due to loss in property appearance, view, use, convenience, and cohesion; and (3) previously admitted relevant evidence concerning how a hypothetical developer would go about determining a purchase price for the property.

The plain language of K.S.A. 26-513 creates a simple and straightforward way to determine and prove up the proper compensation for a partial taking. Within that framework, we will not second guess the specific evidentiary decisions of the trial court absent an abuse of discretion. "Considerable discretion is vested in the trial court in admitting or rejecting evidence of value, and the latitude accorded to the parties in bringing out collateral and cumulative facts to support value estimates is left largely to the discretion of the trial court." *Eisenring*, 269 Kan. at 773-74.

The jury determined that the post-taking remainder—the second statutory variable—had a value somewhere between the valuations properly offered and admitted into evidence by the two parties. As such, that determination, along with the resulting compensation award, was supported by legally sufficient evidence.

2. *Did the district court err in admitting valuation evidence pursuant to a common-law "development approach"?*

As a second, alternative claim of error, KCPL argues that the district court improperly admitted the Strongs' experts' testimony upon an alternative, nonstatutory ground called the "development approach." As we explained in *State Highway Commission v. Lee*, 207 Kan. 284, Syl. ¶ 15, 485 P.2d 310 (1971):

"The development approach in valuing suburban land imminently suited for subdivision and development begins with the selling price of the lots into which the acreage may be divided, which is then reduced by the developmental costs

and discount factors more particularly described in the opinion. Where only a part of the owners' land is taken, the compensation and measure of damages are the difference between the value of the entire property based upon such calculations, and the value of that portion of the tract remaining immediately after the taking based upon such calculations."

KCPL argues that even if this approach is sufficient under our precedents, it was improper here because the Strongs' did not introduce any evidence that development of their property was imminent. There is support in the record for KCPL's contention that the district court admitted the challenged evidence on these grounds. When ruling on one of KCPL's many objections, the district judge reasoned:

"Well, I think, as [the Strongs] pointed out, and consistent with my review of the law, first of all, starting from the statutes, it isn't exhaustive when you talk about the three approaches that are taken. And then what the Kansas Supreme Court, in terms of developmental use and how that fits squarely under the three approaches, to the extent that it does or doesn't, the Supreme Court has at least allowed that concept to be utilized, again, depending upon the case and whether the situation warrants it."

Notably, our precedent describing and applying a "development approach" to compensation awards in partial takings cases predates the legislature's adoption of K.S.A. 26-513(e). See L. 1999, ch. 111, sec. 3. However, based on our holding that the challenged evidence was admissible and legally sufficient to support the jury verdict pursuant to K.S.A. 26-513, we need not decide here the continuing viability of the development approach discussed in *Lee*. The decision of the district court, having reached a legally correct result, will not be disturbed even if the court did assign an erroneous reason for its decision. See *Hockett v. The Trees Oil Co.*, 292 Kan. 213, 218, 251 P.3d 65 (2011).

3. *Did the district court err in admitting evidence of the 2004 option contract?*

*Standard of Review*

For its final claim of error, KCPL contends the district court improperly admitted evidence of the existence of the 2004 option contract between the Strongs and Sailors. Generally speaking,

"[t]he district court 'has broad discretion in determining what evidence will be allowed in an eminent domain proceeding.'" *Mooney v. City of Overland Park*, 283 Kan. 617, 619, 153 P.3d 1252 (2007) (quoting *U.S.D. No. 464 v. Porter*, 234 Kan. 690, 694, 676 P.2d 84 [1984]). When reviewing the admission of evidence, relevancy of the evidence is the first consideration, and evidence is relevant if it has any tendency in reason to prove a material fact. *Sexton*, 284 Kan. at 429-30. Relevancy encompasses two separate components, materiality and probativeness. Evidence is material if the fact it supports is in dispute or in issue and probative if it has a logical tendency to prove a material fact. *In re Acquisition of Property by Eminent Domain*, 299 Kan. 37, 44, 320 P.3d 955 (2014). Appellate courts review materiality de novo and examine the probative nature of the evidence under an abuse of discretion. 299 Kan. at 44. All relevant evidence is admissible unless it is prohibited by statute, constitutional provision, or court decision. *Sexton*, 284 Kan. at 429. A district court abuses its discretion if no reasonable person would take the view adopted by the district court, the decision is based on an error of law, or if the decision was based upon an error of fact. *In re Eminent Domain*, 299 Kan. at 45.

*Analysis*

KCPL claims the existence of the Sailors contract "was irrelevant to both the value of the Strong properties at the time of the taking and to their potential use as a residential subdivision." The Strongs respond that the existence of the contract was relevant to show: (1) development was the most advantageous use of the property to which it is reasonably adaptable; (2) the use and productivity of the property remaining; and (3) the property could be adapted to a use which could be profitably pursued.

The evidence was introduced to show that a developer was interested in developing the property into a single family residential subdivision—so interested that he paid an undisclosed sum to obtain an option to purchase the property. This fact is both material to the existence of the factors set forth in K.S.A. 26-513(d) and at least somewhat probative in that it tends to support the existence

of such factors. The fact that a developer had previously executed a purchase option contract on the Strongs' property leads to a logical conclusion that the land is well suited to the development of a residential subdivision. Indeed, we suspect that this is the very reason KCPL sought so vigorously to keep this evidence from the jury.

Finally, KCPL claims that the contract was in the distant past and thus not relevant. Whether evidence is too remote in time to be admissible lies within the discretion of the trial court. *Manhattan Ice & Cold Storage v. City of Manhattan*, 294 Kan. 60, 73, 274 P.3d 609 (2012).

KCPL relies on *Miller v. Glacier Development Co.*, 284 Kan. 476, 161 P.3d 730 (2007), to support its claim that the district court abused its discretion. In *Miller*, we found that a prior purchase price of property was irrelevant in an eminent domain proceeding because "the prior value of the subject property must be closely related in time and circumstance to the only question before the jury—the fair market value of the land at the time of the taking." 284 Kan. at 492. Similarly, in *Manhattan Ice & Cold Storage*, we held that 3-year-old value estimates were too remote in time from the actual condemnation to be relevant. 294 Kan. at 73-74.

Here, however, the Sailors contract was never offered to establish a monetary value of the property—either pre- or post-taking. The district court properly and carefully excluded the contract price from the evidence presented to the jury. The district court did allow the fact of the contract to come into evidence because, in the district court's discretion, it determined that the fact that a developer pursued the property remained relevant, despite the passage of time, to the issues the jury had to resolve. Developer interest in specific real estate is not generally the kind of market fact—as opposed to actual prices—that is subject to easy, dramatic, and short-lived fluctuations. We cannot say that the Sailors contract was so remote in time from the actual condemnation that it was an abuse of discretion for the district court to admit its existence into evidence.

The judgment of the district court is affirmed.